STATE OF IOWA ex rel. WOODBURY COUNTY ANTI-SALOON LEAGUE, Appellant, v. T. G. CLARK et al., Appellees.

PROSTITUTION, HOUSE OF: Declarations of Inmates. Declara-
1 tions by the inmates of a house are admissible on the issue whether it is a house of prostitution. (Sec. 4944-h9, Code Suppl. Supp., 1915.)

PROSTITUTION, HOUSE OF: Abatement—Knowledge of Owner.
2 A house of prostitution may be abated and the house closed, irrespective of the *knowledge* of the owner of the premises.

PROSTITUTION, HOUSE OF: Imposition of Mulct Tax—Knowl-
3 edge of Owner. Premises which are shown to be used for pur- poses of prostitution are presumptively liable to the $300 mulct tax. Want of knowledge on the part of the owner of such pro- hibited use will defeat the tax, but the owner has the burden to so show.

*Appeal from Woodbury District Court.*—W. G. SEARS, Judge.

JULY 6, 1920.

ACTION in equity to enjoin premises alleged to have been a house of prostitution, and to assess a tax against the property. The Clarks are alleged to have been maintaining the place. During the trial, Carter was substituted for Healy, as the real owner of the property. There was a decree for plaintiff as to the Clarks, but the court denied plaintiff's application to close the building and to impose the tax, under the so-called "Red Light Law." The State appeals.—*Reversed.*

*John F. Joseph,* for appellant.

*Jepson & Struble,* for appellee.

PRESTON, J.—The Clarks did not appear, and their default was entered. The trial court found that prostitution had been carried on in the premises by the Clarks, and that they were a nuisance; ordered the nuisance abated, and the furniture sold. The court refused to order the building closed for a year, and refused to assess the $300 tax. From such refusal the plaintiff has appealed. These are the questions argued, and more particularly the question as to imposing the tax on the property. The ground of the trial court's refusal to assess the tax was that plaintiff had not shown that the owner had knowledge of the nuisance. No constitutional questions were raised in the district court, nor are they argued here by appellee, nor does he cite any cases. Constitutional questions are, therefore, not involved. *State v. Ross*, 186 Iowa 802. Some of the cases hereinafter cited deal with due process and other constitutional questions.

The evidence is undisputed. It appears that special agents for the state were working in Sioux City, and, on December 4, 1918, visited the place in question. Farrand testifies that, after he had sent Mavros ahead of them, he and Van Wagoner followed, and found Mavros in the bedroom with Mrs. Clark, who was dressed in a kimona, or bath robe, and stockings; that, in another bedroom, they found a girl who had on only a shirt, or gauze vest, and a man who did not live there, in his shirt sleeves; that he had given Mavros three $1.00 bills, of which he had taken the numbers; that Mavros had given the money to Mrs. Clark, and it was found in a dresser drawer; that the whereabouts of the Clarks were not known at the time of the trial; that Mrs. Clark told witness that she had been renting out rooms for prostitution, and that she got a dollar for each room, and that she rented rooms to parties who sometimes occupied rooms but for a short time, but not over night; that the girl in the other room made affidavit that she had been there several times. At this point, defendant Healy objected to trying the case on affidavits, and the court sustained the objection; but there was no motion to strike out

the evidence already given. Later, at the close of the testimony of this witness, Healy moved to strike out the testimony of the witness with reference to what others than the defendant Mrs. Clark said, as being hearsay, which was overruled. Healy has not appealed. Mr. Clark was a man 55 or 60 years of age, and the woman was 40 or 45. It was a 5 or 6-room house. It was well furnished,—better than the average home. Mavros says he was at the place alone, about a week before the transaction in question; that another state agent had a report on the house, and wanted him to investigate. He gives the conversation with Mrs. Clark at his first visit as follows:

"When I first got in, she asked me how I knew the place, and I said a friend of mine told me. She says: 'I don't know you, but I guess you're all right. You came here, I suppose, to see the girls?' and I said, 'Yes.' She says, 'I haven't got any in now, but how do I look to you?' I said, 'You look pretty good;' and she said, 'Would you like to spend $3?' and I said, 'Maybe I will come another time. I have some friends, and we will come up some evening, if you can get some girls;' and she says, 'I can do that.' Then I fixed a date two or three days after that,— two days after the time I was talking to her. I was so busy that I didn't go up; didn't get a chance to go at that time; but I telephoned her; asked her if she had the girls; and she said, 'Yes,' and I said, 'If I get a chance, I will come up this evening;' and she told me, 'At any time you get a girl from down town, I charge $1.50 for the use of the room.'"

He testifies that, on December 4th, he and the others planned in the county attorney's office for him to go first to the house, and the others would follow. He describes the transaction as follows:

"I went up and into the house. All the rest of the boys were pretty close,—about a block away. When I got into the house, she says, 'You came back?' and I said, 'Yes.' She said, 'Why didn't you come that night?' and I said, 'I couldn't make it, because I was busy.' She said, 'The girls

are not here right now, but if you wish, you can spend $3
with me.' Then I heard some talking in another room, and
I asked who it was, and she said it was a couple, a man and
a girl. I said, 'What are they doing?' She told me they
were having a good time, having rented a room. She said,
'Do you wish to go into the bedroom and spend $3?' and I
said, 'All right.' We went into the bedroom and undressed.
Of course, I expected the boys any minute. She undressed,
and took the money, and was lying on the bed; and, just
about the time she lay on the bed, there was a knock on
the door. Mr. Farrand knocked on the door, and she said,
'I would like to know who it is,' and I said, 'You go and
see,' and she opened the door, and the boys came in. Be-
fore she went to the door, she put on a nice kimona. The
boys found the other couple there at the same time. I had
given her the three $1.00 bills, of which we had taken the
numbers. There was a little dresser in the room, and she
put it in one of the little drawers. I had only taken my
overcoat off. Yes, I helped arrest the people. I worked
with the boys. Clark was there at the time, in the other
room, in the kitchen. I did not see him until the boys came
in. Yes, I saw him when I first came in. He was in the
parlor, and walked to the kitchen, and I asked, 'Who is
that?' and she said, 'It is my husband,' and I said, 'I am
afraid, if it is your husband,' and she said that she would
take care of him; that he knows it."

Van Wagoner's testimony is similar to Farrand's, except
that he says that the girl in the other bedroom was sitting
on the bed, with her underwear on, and a man was standing
in front of her, with his coat and collar and vest off. All
were placed under arrest. This is the substance of the
testimony. No evidence was given as to the reputation of
the place, and there is no direct evidence that Carter had
knowledge that the nuisance was being maintained therein.
Defendant Carter was the only witness on behalf of the
defendant. He says that Healy used to own a half interest
in the property, and that he, Carter, owns all of it now,

under a contract, though it stands in Healy's name; that he rented the place to Clark on September 15th, and that they have been there ever since; that they were in the place, so far as witness knows, until the "Red Light" case was filed; that the man who rented the place was a man 25 to 35 years old; that he does not know whether he was a son of the others or not—thinks so; that he had known him before, and his name was Clark; that he did not know these Clarks personally, only that that was their name; that the rent was $18 a month.

Though testifying as a witness, he does not state that he had no knowledge that the Clarks were maintaining a house of prostitution, the three months they were occupying it.

1. PROSTITU-TION, HOUSE OF: declarations of inmates.

It is not shown whether he lives close to the property or distant. The evidence is ample to sustain the finding as to the Clarks. The declarations of Mrs. Clark, as testified to by the State's witnesses, and undisputed, were competent, as bearing upon the character of the place. *State v. Toombs,* 79 Iowa 741. Proof of one act is sufficient. *Shideler v. Tribe of the Sioux,* 158 Iowa 417, 423, and cases cited. Though the evidence in this case shows but one transaction, it does not follow that that was the only act. It is a proper inference from the circumstances that the business was being carried on there. The statutes bearing upon the two questions presented are found in the Supplemental Supplement to the Code, 1915, Sections 4944-h1 to 4944-h11.

1. We shall take up first the question as to whether the court should have decreed an abatement of the nuisance by closing the building. No personal judgment is asked against the owner in this respect, but that the nuisance be abated by closing the build-

2. PROSTITU-TION, HOUSE OF: abatement: knowledge of owner.

ing. Section 4944-h1 declares houses of prostitution and the equipment thereof a nuisance, and that they shall be enjoined and abated, as provided in later provisions of the act. Section 4944-h2 provides for the procedure in proceedings for injunction, and that, when such nuisance exists, an ac-

tion in equity may be maintained, to perpetually enjoin said nuisance, the person or persons conducting or maintaining the same, and the owner or agent of the building or grounds, from further permitting such building or ground, or both, to be so used. It provides for notice of the action. Such notice was given the defendant owner in this case. Section 4944-h3 provides that evidence of the general reputation of the place shall be competent for the purpose of proving the existence of said nuisance, and shall be prima-facie evidence of such nuisance and of knowledge thereof, and of acquiescence and participation therein on the part of the owner, etc. Reputation is, of course, not the only way knowledge may be shown. Actual knowledge may be shown, and the circumstances may be such as that, under the duty of the owner of property, as stated in *State v. Ross,* supra, to look after his property, he should know, and we shall see later that he is presumed to know. Knowledge shown by reputation or presumption is possibly not conclusive, but may be rebutted. We are not called upon, in this case, to pass upon the question as to whether it is necessary to show actual knowledge of the owner, because, as the writer thinks, he is presumed to know. The other judges are not willing to go that far, but think and hold that the property is presumptively liable to the tax, and that the burden is on the owner to prove want of knowledge. We agree that the nuisance may be abated and the building closed, regardless of knowledge, since it is not a penalty or punishment, but to prevent the maintenance of the nuisance in the future; and the statute provides for opening of the building, under certain conditions, and by giving bond to prevent a continuance of the nuisance.

The owner did not testify that he did not know. The fact that he took the stand as a witness, and did not so testify, tends, as I think, to strengthen the presumption against him. There are cases holding that, if the truth as to a fact in dispute is peculiarly within the knowledge of one party, especially if the fact is a negative one, the burden of adducing evidence on that point usually rests on him,

although, under other circumstances, the burden would rest on his adversary. Hammon on Evidence 42; *Goodwin v. Provident Sav. L. A. Assn.*, 97 Iowa 226, 242. Other cases hold that, if a party fabricates or withholds evidence concerning a fact in dispute, it gives rise to an inference that a disclosure of the truth would prejudice his case; otherwise there would be no motive for his act; and further, that nonproduction of evidence consists in the mere failure to adduce evidence which it is within the power of the party to adduce. It is a negative term, and so is distinguishable from suppression of evidence, which involves the use of active means to prevent a disclosure. Hammon on Evidence 154, Section 37; 1 Jones' Blue Book of Evidence, Sections 19 and 22. It was a matter within his own knowledge, so that the presumption of knowledge is not, in any way, rebutted.

Section 4944-h5 provides that, if the existence of the nuisance be established in such action or in a criminal proceeding, an order of abatement shall be entered as a part of the judgment, which order shall direct the removal and sale of personal property therein, and shall direct the effectual closing of the building or place against its use for any purpose, and keeping it closed for a year, unless sooner released. Section 4944-h7 provides for a release if the owner appears, and gives bond conditioned that he will abate the nuisance and prevent the same from being established or kept within a year, if the court is satisfied of his good faith. This section seems to contemplate that the nuisance may be abated by closing the building, even though the owner appears after decree, and had not theretofore appeared in the proceeding. See, also, a similar provision as to the tax and the owner's appearance after trial, in Section 4944-h9. To hold that the state or a court of equity is powerless to abate nuisances of this character by closing the building, unless the state is able to show, by affirmative evidence, that the owner had knowledge of the nuisance, would make the remedy provided by the statute ineffectual. Tenants of this character are usually transi-

tory and irresponsible. An injunction against them alone would be of little value. The owner could put another tenant of like character in the premises, and the nuisance would go on, and they in turn be enjoined, and still other like tenants continue the business. We think the intention of the legislature was to effectually abate the nuisance for at least a year, by closing the building, or by a bond on the part of the owner that he will not permit its continuance. Suppose the owner of the building is not in court at all, and is a nonresident of the state; that a slaughter house (or house of prostitution) is maintained in the best residence or business district of a city; that the weather is hot, and the stench is unendurable; that an injunction is obtained against the tenant; that he at once sells his business to another party, who continues the business. It would take a month or two to get notice by publication even, on the owner. Could it be said that the court had no power to effectually abate such a nuisance? It seems to us it could not be so held, even though it be conceded that, as a general rule, it must be shown in some way that the owner had knowledge,—at least, before a personal judgment or decree could be rendered against him. 20 Ruling Case Law 395. The instant case is even stronger than that, because the statute does say that the building shall be closed for a year, when it is proven that the nuisance is maintained therein. The proceeding is *in rem,* so far as the building is concerned. As said, we are not required to determine in this case whether the owner would be liable to such penalty, if he had no knowledge of the character of the business carried on in his property.

The cases go farther than we hold in this case, and hold that the nuisance may be abated and the building closed, without showing knowledge on the part of the owner. It was said in *People v. Barbicre,* 33 Cal. App. 770, 778 (166 Pac. 812, 815), where there was a like question, under a similar statute, and where Iowa statutes and decisions were referred to, that:

"It is contended that neither the owner of a building

which has been declared a nuisance under the statute, nor the building itself, can be bound by the adjudication, unless such owner has knowledge that such building has been and is being used for purposes interdicted by the statute, and that it is not shown here that the owners of the buildings had knowledge of the character of the illicit uses to which they were being put. The action authorized by the statute is *in rem*, or against the property used in the maintenance of the nuisance, as well as *in personam*, or against the person maintaining it; and while, therefore, the owner, having no actual knowledge of the character of the business carried on in his building, might not personally be bound for the costs, the building and furniture may, nevertheless, be proceeded against, and subjected to the forfeitures prescribed by the statute. If, therefore, a building or other property is so used as to make it a nuisance, under the statute, the nuisance may be abated, and the property, if personal, confiscated, and, if real, subjected to the consequences of reasonable forfeitures, notwithstanding that the owner had no knowledge that it was used for the unlawful purpose constituting the nuisance."

The case cites, as sustaining this proposition, *Commonwealth v. Howe*, 13 Gray (Mass.) 26; *Hodge v. Muscatine County*, 121 Iowa 482; *State v. Ryder*, 126 Minn. 95 (147 N. W. 953); *Tenement House Dept. v. McDevitt*, 215 N. Y. 160 (109 N. E. 88); *People v. Casa Co.*, 35 Cal. App. 194 (169 Pac. 454).

Appellant cites *State v. Ross*, supra; but, in that case, knowledge was shown by the evidence. As said, defendant is presumed to have had knowledge of the occupants of his own property. A duty rests upon him to pay some attention to his property, and to the public. These tenants had been in the premises about three months. The evidence clearly shows that prostitutes occupied the building, and that it was maintained as a house of prostitution. On the question as to whether the owner is presumed to have knowledge, it was said, in *Hodge v. Muscatine County*, 196 U. S. 276 (49 L. Ed. 477, 481):

"The owner is not only chargeable with a knowledge of the law in respect thereto, but he is presumed to know the business there carried on, and to have let the property with knowledge that it might become incumbered by a tax imposed upon such business (citing *Sheldon v. Van Buskirk,* 2 N. Y. 473; *Brown Shoe Co. v. Hunt,* 103 Iowa 586; *Polk County v. Hierb,* 37 Iowa 361; *State v. Snyder,* 34 Kan. 425; *Hardten v. State,* 32 Kan. 637; *Sears v. Cottrell,* 5 Mich. 251; *Waldron v. Lee,* 5 Pick. (Mass.) 323; *Spencer v. McGowen,* 13 Wend. (N. Y.) 256; *Simpson v. Serviss,* 3 Ohio C. C. 433)."

2. We come next to the question whether the court should have imposed the $300 tax. Some of the discussion in the prior paragraph, particularly in regard to knowledge and presumption, is applicable to this feature of the case, and will not be repeated. The statute on this feature of the case, Section 4944-h8, seems to be plain and mandatory. It provides:

3. PROSTITUTION. HOUSE OF: imposition of mulct tax: knowledge of owner.

"Whenever a permanent injunction issues against any person for maintaining a nuisance as herein defined, or against any owner or agent of the building kept or used for the purpose prohibited by this act, there shall be imposed upon said building and the ground upon which the same is located and against the person or persons maintaining said nuisance, and the owner or agent of said premises, a tax of $300. The imposing of said tax shall be made by the court as a part of the proceeding, and the clerk of said court shall make and certify a return of the imposition of said tax forthwith to the county auditor, who shall enter the same as a tax upon the property and against the persons upon which or whom the lien was imposed * * * and the same shall be and remain a lien on the land upon which lien was imposed until fully paid. * * * The payment of said tax shall not relieve the persons or property from any other penalties provided by law."

Section 4944-h9 reads:

"When such nuisance has been found to exist under any

proceeding in the district court or as in this act provided, and the owner or agent of such building or ground whereon the same has been found to exist, was not a party to such proceeding, nor appeared therein, the said tax of $300 shall, nevertheless, be imposed against the persons served or appearing and against the property as in this act set forth."

Then follow provisions as to the method of appearance by the owner after trial. Upon such appearance and trial by the owner, even after trial as against the occupants, and if the tax has been imposed without appearance of the owner, such owner may not be entitled to have the imposition of the tax canceled, but the court may, upon such trial as to the owner, modify, add to, or confirm such finding and judgment, as the case may require. Under these, the tax is imposed when the injunction issues against the person maintaining the nuisance, or against the owner, and whether the owner is a party to the suit or not. Our statute providing for a tax on property wherein cigarettes are sold is quite similar, so far as the tax question is concerned, to the statute now under consideration. In *Hodge v. Muscatine County*, 121 Iowa 482, 488, we held that such a tax is a tax upon the business, or traffic. The Supreme Court of the United States also so held, in the same case, and that the cigarette tax was analogous to the cigarette statute. *Hodge v. Muscatine County*, 196 U. S. 276 (49 L. Ed. 477, 481). In this last-named case, the Supreme Court of the United States said:

"It was within the power of the legislature to make the tax a lien upon the property whereon the business was carried. If general taxes upon real estate and specific taxes for improvements thereto, including pavements, sidewalks, sewers, the opening of streets and keeping them clean, may be made liens upon the property affected, it is difficult to see why a tax upon the business carried on upon such property may not be made a lien, as well as a claim against the owner. The owner is not only chargeable with a knowledge of the law in respect thereto, but he is presumed to know

the business there carried on, and to have let the property with knowledge that it might become incumbered by a tax imposed upon such business.  *  *  *  Acts of Congress impressing liens upon real estate for taxes or penalties arising from business illegally carried on there have been the frequent subject of controversy in this court.  Conceding that the landowner is entitled to notice before he can be personally liable, or before his property can be impressed with a lien, we are of opinion that he is protected by Sections 2441 and 2442, which permit him to make application at the meeting of the board of supervisors next following the listing of the property, the sessions of which board are fixed by law,  *  *  *  to remit the tax.  This application may be made at any time after the property has been assessed, upon eight days' notice being given to the county attorney.  Witnesses are examined under oath before the board, which determines by a majority vote whether the tax shall stand or be remitted.  *  *  *  In this case, the landowner states that she had no knowledge whatever that her real estate was being used for the sale of cigarettes, until after the assessment was levied, and never consented to the same; that she resides in Illinois, and rented the property through an agent, who had had no knowledge himself of the sale of cigarettes upon the premises.  There is no allegation, however, that she did not have knowledge within ample time to make application to the board of supervisors for the remission of the tax.  If such application had been made, it would have been the duty of the board to take the matter into consideration, and determine whether her want of knowledge would justify the remission of the tax.  It is not for us to determine whether the defense be a valid one, since, having the opportunity to make it, she declined to do so."

The statutes now under consideration provide that the landowner may make such showing, but the statute does not say, nor does the case last cited hold, that want of knowledge is a defense.  Appellant cites *State v. Fanning,* 97 Neb. 224 (149 N. W. 413).  It was there said that:

"It is not necessary to prove that the owner of the prop-

erty knew that it was being used for the prohibited purposes; if the proprietor (that is, the person in control and management of the house) has such knowledge, it is sufficient."

That was under a statute of Nebraska, which provides a penalty if the person owning or having the control, knowingly leases the property for such purposes, etc. In that case, the court further said:

"The object of the statute is to provide an efficient and prompt means for suppressing the so-called 'Red Light District' in communities that are unwilling to tolerate such a nuisance. * * * The statute is a wholesome one. It ought to be liberally construed, to enable virtuous communities to protect themselves against public places kept for lewd purposes."

Appellant cites *State v. New England F. & C. Co.,* 126 Minn. 78 (147 N. W. 951), and *State v. Ryder,* 126 Minn. 95 (147 N. W. 953), as having a bearing. The opinion is already too long, and we shall not take the time or space to further discuss the matter.

We are of opinion that the trial court erred in not ordering the nuisance abated for a year, as provided by the statute, and in not imposing the $300 tax. The cause is reversed and remanded, with directions to enter a decree in harmony with this opinion and the statutes on the subject.—*Reversed and remanded.*

WEAVER, C. J., EVANS and SALINGER, JJ., concur.